IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BREINIG-PRUITT V. WESTFAHL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

AARON BREINIG-PRUITT, APPELLANT,

V.

KACIA WESTFAHL, APPELLEE.

Filed February 12, 2019.    No. A-18-398.

Appeal from the District Court for Dawson County: JAMES E. DOYLE IV, Judge. Affirmed as modified.

Bergan E. Schumacher, of Bruner Frank, L.L.C., for appellant.

No appearance for appellee.

MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

In this paternity action, Aaron Breinig-Pruitt appeals the order of the Dawson County District Court awarding joint legal custody and primary physical custody of his minor son, Kobyn Pruitt, to Kobyn's mother, Kacia Westfahl. He also appeals the details of the parenting plan, child support calculations, and the award of childcare expenses. We affirm the district court's order except that we resolve a scrivener's error in the court's order relating to the award of childcare expenses.

- 1 -

STATEMENT OF FACTS

PROCEDURAL AND UNCONTESTED FACTUAL BACKGROUND

In January 2013, Kobyn was born in Nebraska to Westfahl and Breinig-Pruitt. Breinig-Pruitt, Westfahl, Kobyn, and Alexis (Westfahl's daughter from a previous relationship) lived together until July when Breinig-Pruitt and Westfahl ended their relationship. Westfahl then moved to Colorado with the children.

Westfahl married Justin Westfahl in July 2014. From July of that year until the time of trial, Westfahl lived with Justin, Alexis, and Kobyn. The only exception was a temporary period when Justin and Westfahl were separated. Breinig-Pruitt married Lacey in May 2015. From May 2015 up to the time of trial, Breinig-Pruitt has lived with Lacey and, later, their child, Kash, who was born approximately 3 months before the first day of trial.

On June 23, 2016, Westfahl filed a petition for allocation of parental responsibilities in Sedgwick County, Colorado, claiming that Kobyn had been in her care since she and Breinig-Pruitt separated in July 2013 and that Kobyn "has established a life here in Sedgwick County." The following day, Breinig-Pruitt filed a complaint in the Dawson County District Court alleging that Kobyn was domiciled in Dawson County on the date both Westfahl's petition and Breinig-Pruitt's complaint were filed. Breinig-Pruitt sought a determination of custody, parenting time, and child support.

On July 12, 2016, the court held a hearing to set temporary orders. In connection therewith, Breinig-Pruitt offered an affidavit alleging that Kobyn had split his time between Nebraska with Breinig-Pruitt and Colorado with Westfahl, alternating approximately monthly since October 2013. The court determined that it could not rule until it conferred with the Colorado court, where Westfahl had filed, to determine which state had jurisdiction.

On August 25, 2016, the Dawson County District Court conferred with the Colorado court, with both parties present, regarding which court should exercise jurisdiction over the case. When the judges stated that their understanding was that Kobyn had been back and forth between Colorado and Nebraska and did not have a home state, the parties were invited to comment. Westfahl responded, "I do agree with the statements that, yes, we were doing a month co-parent and, then, back and forth." The judges determined that the Nebraska court had jurisdiction in this case because Kobyn did not have a home state and Breinig-Pruitt properly effected service first.

On October 20, 2016, the court held a scheduling hearing. The court noted that it had received exhibits from the parties to support a temporary order. On November 8, the court filed an order including scheduling, temporary custody, and temporary child support. The court ordered the parties to alternate physical custody of Kobyn on a 2-week rotating basis. The court ordered Breinig-Pruitt to pay $64 each month in child support.

A 2-day trial was held in September and December 2017. The following witnesses testified on behalf of Breinig-Pruitt: Breinig-Pruitt; Lincey McDonald (Lacey's sister); Judy Martin (Lacey's mother); Wendy Breinig (Breinig-Pruitt's mother); Amber Taylor (Lacey's friend); and Ranae Lux (Kobyn's preschool teacher and daycare provider). The following witnesses testified on Westfahl's behalf: Westfahl; her husband Justin Westfahl; and Dena Strick (Westfahl's mother).

Westfahl testified that, from January to July 2013, she stayed at home caring for Kobyn and Alexis. She claimed that Breinig-Pruitt "rarely" gave Kobyn a bottle and that he changed "maybe two or three" diapers that entire time. She testified that when Breinig-Pruitt got home from work, he would kiss the children and go outside to play with the horses or work in the yard. During a confrontation in July 2013, Westfahl testified that Breinig-Pruitt became "verbally and emotionally abusive, started saying it was my fault -- my fault, I was the one that caused it. Um, I didn't love him." Westfahl testified that when she called to ask her mother to come get her and the children, Breinig-Pruitt told her "to take the 'F'-ing brats and go; and that's when he stormed out." Westfahl's mother, Strick, testified that, during the phone call, she overheard Breinig-Pruitt make that statement while screaming obscenities and calling Westfahl names. Westfahl testified that she asked Breinig-Pruitt if he wanted to say goodbye to Kobyn, and he said no. Conversely, Breinig-Pruitt denied yelling at Westfahl or telling her to take the "F"-ing brats and get out, testified that he made a point to hold Kobyn before Westfahl left, and testified that he changed many diapers and fed Kobyn many bottles.

The evidence in this case governing the time Kobyn spent with each parent varied drastically. Westfahl testified that, after moving to Colorado, she sometimes visited Breinig-Pruitt's parents to allow them to have time with their grandson, Kobyn. Westfahl testified that during a visit to Breinig-Pruitt's parents over Halloween of 2013, she intended to allow Kobyn to visit his father, however, Kobyn was asleep when Breinig-Pruitt arrived. According to Westfahl, the first time that Breinig-Pruitt saw Kobyn after Westfahl moved to Colorado was at Kobyn's first birthday party, which was held while Westfahl and Kobyn visited Breinig-Pruitt's parents. Westfahl testified she allowed Breinig-Pruitt's parents to see Kobyn every other weekend from May 2014 until June of 2016, and did this by exchanging Kobyn at a mutually agreeable exchange location. Westfahl said that, in February 2016, she found out that Kobyn had actually been staying with Breinig-Pruitt for these weekend visits. During the last exchange before this case initiated in approximately May 2016, Westfahl testified that Breinig-Pruitt picked up Kobyn at the exchange, which Westfahl described as "odd." According to Westfahl, this May 2016 exchange was the first time that Kobyn spent more than a weekend in Nebraska since she moved to Colorado. She testified that, before January 2016, it was almost always Breinig-Pruitt's mother, father, or brother who met her at exchanges to pick up or drop off Kobyn for his weekend visits with his grandparents. She testified that from about January to June 2016, Breinig-Pruitt used very vulgar language at the exchanges, she was scared to attend the exchanges by herself, and she would leave the exchanges in tears.

Westfahl testified that around June 1, 2016, she called Breinig-Pruitt's mother to ask if she knew of any rental properties in the area. Westfahl testified she had separated from Justin and planned to relocate because of her close relationship with Breinig-Pruitt's parents. Before the end of the scheduled visitation, Breinig-Pruitt texted Westfahl and requested to extend Kobyn's visitation due to an appointment with an eye doctor the following week and Westfahl agreed. Later, when she texted and called to arrange to pick up Kobyn, Breinig-Bruitt would not set a day and told her that she was not emotionally stable enough to care for Kobyn. Westfahl regained physical

custody of Kobyn on June 27 after obtaining an "Ex Parte Warrant to Take Physical Custody of Child" from a Colorado court.

Breinig-Pruitt presented a significantly different version of his visitation with Kobyn. Breinig-Pruitt testified that Kobyn's first 6-week summer visitation with him occurred in 2014 and that "up until the summer of 2016 [he] . . . had Kobyn two weeks here and there and, then, six weeks in the summer." He testified that he started picking up and dropping off Kobyn in 2014 and he never attempted to deceive Westfahl on where Kobyn was staying when he visited Nebraska. On cross-examination, Breinig-Pruitt was confronted with his statement from his affidavit stating that he had Kobyn every other month. He stated that sometimes it was a month, and on redirect said that they tried to simplify it for the affidavit. Breinig-Pruitt denied mistreating Westfahl at the exchanges.

Strick, Westfahl's mother, stated that after Westfahl moved to Colorado, Westfahl would take Kobyn to visit Breinig-Pruitt's parents and stay with Kobyn during the visit, but over time, Strick stated that Westfahl would leave Kobyn with Breinig-Pruitt's parents. Wendy, Breinig-Pruitt's mother, testified that the first time she had Kobyn for more than a weekend was in the summer of 2014.

### LIFE AT BREINIG-PRUITT'S HOME

Breinig-Pruitt testified he is a self-employed truck driver and works 40-50 hours per week in summer and winter, 50-60 hours per week in the spring, and around 80 hours per week in the fall during harvest. He testified that he adjusts his schedule when he has Kobyn and could and would adjust his schedule to be home by 5 p.m. regularly if he were granted custody. Breinig-Pruitt and his wife, Lacey, have a baby, Kash, who was born with hypoplastic left heart syndrome. Kash has had surgeries and will require future surgeries, and may eventually need a heart transplant. Lacey is a stay-at-home mother in order to care for Kash. Breinig-Pruitt testified that Lacey could not testify because she was with Kash who was hospitalized in Omaha.

Breinig-Pruitt testified that when Kobyn is at Breinig-Pruitt's home, he resides with Breinig-Pruitt, Lacey, and Kash. Kobyn has his own room at Breinig-Pruitt's home. Kobyn attends a daycare that includes preschool activities. Lux, who is Kobyn's preschool teacher and daycare provider, testified that Breinig-Pruitt typically picks up and drops off Kobyn at daycare and is always on time.

Breinig-Pruitt testified that during the week, Kobyn typically eats dinner with the family at 6:30 or 7 p.m., reads a book or plays outside, gets a bath, and is in bed around 7 or 7:30 p.m. On evenings when Kobyn is not in school, he is normally in bed by 8:30 p.m. When living at Breinig-Pruitt's house, Kobyn attends a weekly Bible class for children. Breinig-Pruitt testified that he has taken Kobyn to the doctor, dentist, and to an eye doctor and that Kobyn's immunizations are current.

Both Breinig-Pruitt and Martin described Kobyn's attachment to Kash. Martin testified that when Kobyn leaves, he touches Kash and says "Good-bye, baby Kash, I love you so much." Breinig-Pruitt testified that when Kobyn leaves, he will cry and give Kash a kiss and say "I don't want to leave you, baby Kash."

Martin (Lacey's mother) testified to the strong bond that Breinig-Pruitt and Kobyn share. When asked what they like to do together, she responded "[a]nything with wheels or legs, cattle, horses. He loves tractors, trucks, four-wheelers." She described how if they are watching television, Kobyn would crawl into Breinig-Pruitt's lap and curl up, and they would hug and whisper. Martin testified that she presumed, but did not know, if Breinig Pruitt introduces Kobyn to people, and said that "if he doesn't, Kobyn is going to introduce himself." Martin testified that, in addition to visits at her home, she also sees Breinig-Pruitt and Lacey with Kobyn at church, the fair, hog wrestling, and horse shows. She testified that Breinig-Pruitt and Kobyn are close, and that if Kobyn has a fit, Breinig-Pruitt "can talk him out of it." She also testified that Breinig-Pruitt takes Kobyn "everywhere."

Breinig-Pruitt testified that Kobyn always wants to be with him and is excited to see him at exchanges. His mother, Wendy, testified that Breinig-Pruitt is teaching Kobyn to ride a bike, and takes him to the store and "they will go to restaurants and stuff all the time, so he has a lot of social interaction with people." Wendy testified that "Kobyn likes Grandma until he sees daddy; and, then, grandma's nothing."

Lux testified that Kobyn was excited when his dad came to pick him up. When she talked with the kids about what they were grateful for, Kobyn said he was grateful for his dad and Lacey. She testified that Kobyn is very close with Lacey and typically refers to her as "my Lacey." Lux also testified that Kobyn was making friends and mentioned three names of boys that "are the main ones he tends to play with." Lacey's longtime friend Taylor testified that, when Kobyn and Lacey are together, their interactions look like they are mother and son.

## LIFE AT WESTFAHL'S HOME

After moving to Colorado, Westfahl moved in with her parents. Westfahl has lived in five places since she moved to Colorado. She has also held about seven jobs since moving to Colorado. On the second day of trial in December 2017, she was working about 20 hours per week earning $10 per hour. This job allowed her to drop off Kobyn at preschool and to pick up Kobyn during her lunch break and make him lunch. Westfahl testified that she was capable of working full-time at $10 per hour, but she chose not to in order to spend more time with Kobyn. Although Westfahl testified that a babysitter watches Kobyn during her afternoon work hours, no evidence was adduced as to the cost of this babysitter or other childcare options. Justin works full time as a truck driver. She further testified that the reason she wanted her husband to testify was because he had seen firsthand how Breinig-Pruitt treated her at exchanges. Instead, when called, Justin never testified to Breinig-Pruitt's behavior during the exchanges. Justin testified exclusively to Kobyn's reaction to the exchanges and interaction with Breinig-Pruitt.

Westfahl established that when Kobyn is at Westfahl's home, he resides with Westfahl; Justin; and Kobyn's 6-year-old half sister, Alexis. Kobyn has his own room when living with Westfahl. Westfahl testified on the second day of trial in December 2017 that, on most weekdays, Westfahl takes Alexis to school at 7:45 a.m. and takes Kobyn to preschool at 8:45 a.m. She works from around 9 a.m. to noon, then picks up Kobyn, and takes him home for lunch. After lunch, she has a babysitter watch Kobyn until she gets off work at 3 p.m. Strick (Westfahl's mother) testified that Kobyn eats supper around 6:30 p.m. and his bedtime in the summer is 8:30 p.m.

On the first day of trial, in September, Strick testified that Kobyn was enrolled in preschool in Colorado, but was not going to start until after the first day of trial. Justin testified that the preschool did not want Kobyn to attend preschool and then be absent for 2 weeks while he was in Nebraska. Justin also explained that Kobyn had developmental delays which had delayed the start of his preschool education.

Justin testified that, in addition to attending preschool, Kobyn gets chances to play with other children, that Kobyn makes friends easily, and that Kobyn had made friends with a girl in the neighborhood who only speaks Spanish. Further, Westfahl testified that Kobyn has a pediatrician in Colorado and she has identified a new eye clinic that will be available for Kobyn to visit.

Both Westfahl and Justin testified that Westfahl and Kobyn have a strong relationship and a healthy attachment. For example, Justin testified that Kobyn gets into arguments with Alexis because he wants to be on Westfahl's side of the car. Westfahl takes Kobyn on errands and "everywhere because he won't have it any other way." Strick also testified that, before this case, Kobyn and Alexis were inseparable. She testified that she participated in about 75 percent of the exchanges which occurred before this case started which she described as "easily ten." She stated that, during those exchanges, Alexis was confused why she and Kobyn had to be separated and Kobyn would cry.

Justin also described Kobyn and Alexis as "inseparable" and described that some of their activities included riding bikes and playing in the sandbox. Justin testified that Kobyn also has "an amazing relationship" with Westfahl's parents, and sometimes works with his grandpa in the garage. He testified that he would be worried for Kobyn's mental well-being if Breinig-Pruitt were awarded physical custody of Kobyn because it would take him away from Alexis; conversely, Wendy testified that Alexis and Kobyn had a good relationship, but it was a typical brother and sister relationship and they were not "super-close."

Westfahl testified that Justin frequently spends time with Kobyn and that Kobyn loves Justin. She testified that Justin sometimes transports Kobyn to school or wherever else he needs to go. Justin testified that they use "learning care books" to work with Kobyn and Justin is helping Kobyn learn things such as bones in the skeleton.

Justin testified that he was charged with sexual assault of a child, convicted of contributing to the delinquency of a child and criminal mischief, and sentenced to 90 days in jail in 2009 or 2010. Justin has been convicted twice of driving under the influence and he has been convicted once of driving under suspension. Further, in March 2015, Justin and Westfahl were charged with child neglect and abuse to which Westfahl plead guilty. The children were removed from Westfahl's care for a period of time and placed with Strick. Justin testified the charges stemmed from a situation in which Westfahl was at work and he had been up all night with Kobyn because Kobyn was sick. Justin testified that when he fell asleep, Alexis and 2½-year-old Kobyn got dressed in warm clothes and went into the front yard where they were eventually found by the county sheriff. The district court was satisfied that Westfahl had little control over the situation and had taken sufficient precautions to make sure a similar situation would not happen again.

Westfahl testified that Breinig-Pruitt had been ordered to pay $64 per month in temporary child support and that he was not current on child support. Breinig-Pruitt testified that he was current. Neither Westfahl nor Breinig-Pruitt offered documentation to support their testimony.

District Court's Order

On March 30, 2018, the district court awarded the parents joint legal custody of Kobyn but granted sole physical custody of Kobyn to Westfahl. In reaching this determination, the district court considered statutory factors as required as well as other factors allowed by the Supreme Court. The district court considered the relationship of each parent to the child. The court found that Westfahl "spent more time with the child during the earliest years of his life and because she has determined to spend more of her time with the child instead of working."

The district court considered the environment offered by each parent. The court noted Justin's convictions for contributing to the delinquency of a child and criminal mischief, but did not mention any sexual assault charges. The court also discussed the time when Kobyn was found playing unsupervised in the front yard and was removed from her home. The court concluded that Breinig-Pruitt offered a more stable environment but found that this factor weighed marginally in favor of Westfahl because "she is in her environment much more than is [Breinig-Pruitt] and is present at the time when her children need her care as compared to [Breinig-Pruitt's] availability."

The district court also found that Westfahl would be more able to care for Kobyn's educational, social, and other needs because

> the one important resource [Westfahl] has allocated more heavily towards the care of the child than has [Breinig-Pruitt] is her allocation of time. [Westfahl] testified she has arranged her work schedule and intends to continue to arrange her work schedule to allow her to care for her children. [Breinig-Pruitt] on the other hand, works long hours . . . [his] work takes him away from his child and he is therefore dependent upon others to care for his child while he is away.

The district court found that the stability of character weighed in favor of Westfahl. The court noted that each had strengths and weaknesses, but "[t]he factor bearing on the character of each parent which tips the balance in [Westfahl's] favor was the evidence of the effort [Breinig-Pruitt] and his allies made to mislead the court in the determination of the contact between the child and Nebraska and the demeanor evidence." The district court did not mention any testimonial inconsistency on Westfahl's part. Finally, the district court indicated there was evidence that "the separation of the child from his half sister has had an adverse impact upon the child."

The court ordered Breinig-Pruitt to pay $353 in monthly child support, to provide medical insurance for Kobyn, and to provide 50 percent of Kobyn's childcare expenses "incurred and actually paid by [Westfahl] to an unrelated third party for the care of the minor child while [Westfahl] is at work." That same paragraph of the order stated that, "[w]ithin five days of his receipt of such document, [Breinig-Pruitt] shall reimburse [Westfahl] for 74 percent of such costs." Breinig-Pruitt now appeals.

## ASSIGNMENTS OF ERROR

Breinig-Pruitt contends that the district court abused its discretion (1) in failing to grant him sole legal custody of Kobyn; (2) in failing to grant him sole physical custody of Kobyn; (3) in limiting his telephone contact with Kobyn; (4) in calculating child support; and (5) in ordering him to pay childcare expenses.

## STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *State on behalf of Kaaden S. v. Jeffery T.*, 26 Neb. App. 421, 920 N.W.2d 39 (2018); *Derby v. Martinez,* 24 Neb. App. 17, 879 N.W.2d 58 (2016).

## ANALYSIS

### JOINT LEGAL CUSTODY

Breinig-Pruitt contends that the district court abused its discretion by failing to award him sole legal custody of Kobyn. He argues that the district court erred in awarding joint legal custody despite acknowledging that the parents' level of communication was insufficient to support a joint physical custody arrangement.

"Joint legal custody" is defined as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). Neb. Rev. Stat. § 42-364(3) (Reissue 2016) provides:

> Custody of a minor child may be placed with both parents on a joint legal custody or joint physical custody basis, or both, (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent.

Section 42-364 applies to custody disputes in paternity actions. *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

"We acknowledge that courts typically do not award joint legal custody when the parties are unable to communicate effectively. However, a trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests." *Id*. at 516, 873 N.W.2d at 218. For example, in *Kay v. Ludwig*, 12 Neb. App. 868, 686 N.W.2d 619 (2004), this court upheld the trial court's determination of joint legal custody despite the mother's testimony regarding great difficulties in communicating with the father.

Here, Breinig-Pruitt argues that the district court abused its discretion because the court "acknowledged that the 'level of communication between the parents is not sufficient to support a joint physical custody arrangement' yet still awarded a joint legal custody arrangement." Brief for appellant at 7. However, in determining that a joint physical custody arrangement was not a good fit here, the district court first noted that the evidence weighed against a joint physical custody arrangement because of the distance between the parties' homes and the difficulties that would be encountered when Kobyn began elementary school. Further, although Breinig-Pruitt testified that he and Westfahl have difficulty making decisions together regarding Kobyn, the only actual disagreement regarding Kobyn's upbringing that he could identify was Kobyn's religious education. Based upon our review of the record, including but not limited to the clear evidence that both parents love and care deeply for Kobyn, and giving weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another, we find that the district court did not abuse its discretion in awarding the parents joint legal custody.

PHYSICAL CUSTODY

Next, Breinig-Pruitt contends that the district court erred in failing to award him sole physical custody of Kobyn. Custody of a minor child is determined by the child's best interests. *Ensrud v. Ensrud*, 230 Neb. 720, 433 N.W.2d 192 (1988). The best interests of a child requires:

> (1) A parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children;
>
> . . . .
>
> (3) That the child's families and those serving in parenting roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child;
>
> . . . .
>
> (6) In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. . . . and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Neb. Rev. Stat. § 43-2923 (Reissue 2016). In determining the best interests of a child, courts may also consider the respective environments offered by each parent, the effect on the child as the

result of continuing or disrupting an existing relationship, and the attitude and stability of each parent's character. *Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779 (1998).

Both Breinig-Pruitt and Westfahl are married and have children who are close to Kobyn. Both parents are in good health and Kobyn appears to be in good health except for an issue with his eyesight, which is being attended to by both parents. Kobyn appears to be socially adjusted and developing appropriately which can be attributed, in no small part, to Westfahl's care of Kobyn. We further note that, although Brenig-Pruitt makes much of the alleged "child abuse" allegation, the district court, and this court, are satisfied that the circumstances were largely out of Westfahl's control and are unlikely to recur. Further, in its order, the court emphasized its reliance upon its observation of the parties' demeanor during their testimony in reaching a decision in this case. The court stated:

> The factor bearing on the character of each parent which tips the balance in [Westfahl]'s favor was the evidence of the effort [Breinig-Pruitt] and his allies made to mislead the court in the determination of the contact between the child and Nebraska and the demeanor evidence. In this regard, the demeanor evidence was quite important. In determining all the issues in this case, but most particularly the factor of the attitude and stability of each parent's character, the court considered the demeanor of the witnesses while testifying. In particular, the court considered the manner in which each witness composed answers to questions, the time each witness took to respond to the questions, including the hesitation or readiness with which answers were given, the directness of the answers, the tone and pitch of voice used, the emphasis placed on words, earnestness and zeal displayed, facial expressions, the eye movements of the witness, furtive or meaningful glances, shrugs, yawns, self-possession or embarrassment, the witness' air of candor or seeming levity, voice quality and the bearing of each witness. The demeanor evidence weighted in [Westfahl]'s favor.

In our de novo review, we may give weight to the fact the trial court heard and observed the witnesses and accepted one version of the facts rather than another. See *State on behalf of Kaaden S. v. Jeffery T.*, 26 Neb. App. 421, 920 N.W.2d 39 (2018). Here, the district court's order goes to great length to make extensive and specific findings regarding each parties' demeanor during their testimony, which the cold record before this court does not reflect. This court places weight in the district court's observation of the witnesses and its consideration of their demeanor. Based upon our review of the record, and giving weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another, we find that the district court did not abuse its discretion in awarding Westfahl primary physical custody of Kobyn.

TELEPHONE CONTACT

Breinig-Pruitt assigns that the district court abused its discretion in limiting his telephone contact to 15 minutes 3 days per week between 7 and 8 p.m. when there was no evidence that either parent abused telephone contact.

Breinig-Pruitt misconstrues the language of the parenting plan. The parenting plan does not limit his telephone contact with Kobyn to 15 minutes three times per week; it requires Westfahl

to allow him at least 15 minutes of telephone contact with Kobyn during the specified hour three times per week. The parenting plan does not prohibit Breinig-Pruitt from calling outside of the designated time periods and requesting to speak to Kobyn provided that such requests are reasonable and not disruptive. In response to Breinig-Pruitt's complaint that the parenting plan includes specific times for telephone contact between himself and Kobyn, we recognize and acknowledge that some specific details need to be set forth in order to prevent future disputes. The district court did not abuse its discretion by including, in the parenting plan, specific minimum times for telephone contact between Breinig-Pruitt and Kobyn.

## CHILD SUPPORT

Breinig-Pruitt contends that district court erred in using $1,617 as the earning capacity for Westfahl because there is no evidence in the record to support that figure. Instead, he claims the court should have used $1,733 as Westfahl's earning capacity.

If applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Neb. Ct. R. § 4-204. Earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018).

Westfahl testified that she was working about 20 hours per week making $10 per hour and that she was capable of working full-time at $10 per hour, but she chose not to in order to spend more time with Kobyn. The record further established that $9.33 was the minimum wage in Colorado at that time of the trial.

The district court calculated Westfahl's earning capacity at $1,617, based upon a 40-hour workweek at $9.33 per hour. Even if the court would have imputed a 40-hour workweek to Westfahl earning $10 per hour, this would have made her earning capacity $1,733 per month. The court chose to use Westfahl's earning capacity instead of her actual, present income in determining child support, and chose to use Colorado's minimum wage instead of the slightly higher hourly wage that Westfahl was earning in her part-time job. Neither choice was an abuse of discretion.

## CHILDCARE EXPENSES

Breinig-Pruitt contends that there was no evidence of childcare expenses adduced during the trial and, therefore, he should not have been ordered to pay for childcare expenses. Additionally, he notes that the order sets forth that he is to provide 50 percent of Kobyn's childcare expenses, but in the same paragraph of the court's order it states that he is to reimburse Westfahl for 74 percent of the childcare costs.

Neb. Ct. R. § 4-214 provides:

> Childcare expenses are not specifically computed into the guidelines amount and are to be considered independently of any amount computed by use of these guidelines. Care expenses for the child for whom the support is being set, which are due to employment of either parent or to allow the parent to obtain training or education necessary to obtain a job or enhance earning potential, shall be allocated to the obligor parent as determined by the court, but shall not exceed the proportion of the obligor's parental contribution

(worksheet 1, line 6) and shall be added to the basic support obligation computed under these guidelines.

Here, the evidence established that Westfahl is employed part-time and that childcare is sometimes necessary for Kobyn during her work hours. The guidelines provide that childcare expenses due to either parent's employment or education and expenses shall be allocated to the obligor parent in an amount determined by the court, so long as the court does not exceed the proportion of the obligor's parental contribution. See *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). Thus, the district court did not abuse its discretion in allocating 50 percent of these childcare expenses to Breinig-Pruitt. However the requirement that Breinig-Pruitt reimburse Westfahl for 74 percent of such costs appears to be a scrivener's error and is modified to require him to reimburse Westfahl 50 percent of the childcare costs incurred and actually paid by Westfahl to an unrelated third party for the care of the minor child while Westfahl is at work.

## CONCLUSION

In sum, we find no abuse of discretion on the part of the district court but we modify the portion of the court's opinion in which a scrivener's error required Breinig-Pruitt to reimburse Westfahl for 74 percent of her childcare costs for Kobyn. That portion of the district court's order shall be modified to require a 50-percent reimbursement.

AFFIRMED AS MODIFIED.